**NEW ENGLAND NATURIST ASSOCIATION, INC., et al.**

v.

**Howard N. LARSEN, et al.**

**Civ. A. No. 88–0218T.**

United States District Court, D. Rhode Island.

July 29, 1988.

Stephen J. Fortunato, Jr., Providence, R.I., for plaintiffs.

Everett C. Sammartino, U.S. Atty's Office, Providence, R.I., for defendants.

## MEMORANDUM AND ORDER

TORRES, District Judge.

This matter is before the Court on the plaintiffs' request for a preliminary injunction that would require the defendants to dismantle a fence which they have erected on a portion of Moonstone Beach and prohibit the defendants from taking any other actions that would bar the plaintiffs from going upon the beach.

## FINDINGS OF FACT

New England Naturist Association, Inc. (the "Association") is a non-business corporation chartered under the laws of the State of Rhode Island. Its principal purpose is to provide activities for persons interested in nudism. For many years, its members have regularly gathered during the summer months at Moonstone Beach to swim, sunbathe, and otherwise share their mutual interest in nudism. The individual plaintiffs include members and officers of the Association and non-members who frequent the beach to swim and sunbathe while attired in swimsuits. The defendants are officials of the Fish and Wildlife Service ("FWS") of the United States Department of the Interior who are charged with responsibility for managing the Trustom Pond National Wildlife Refuge (the "Refuge") on which most of Moonstone Beach is located.

The Refuge is located in the Town of South Kingstown, Rhode Island. Initially, it consisted of 365 acres of land that was donated to FWS in 1974. Subsequent donations and purchases have expanded its size to approximately 641 acres. It is composed primarily of grassy sand dunes, marsh land, and ponds. Because of these features, the Refuge is a prime nesting area for several species of birds, including the Piping Plover and the Least Tern, which lay their eggs in the sand during the spring and, together with their fledglings, feed along the shore during the summer months. The southerly border of the Refuge abuts the waters of Block Island Sound and consists of an expanse of sand approximately 120 feet wide and more than 7,000 feet long which is known as Moonstone Beach. The beach runs in an east-west direction and is intersected near its easterly end by a 30 foot right-of-way known as Moonstone Beach Road which provides members of the public with access to the shore.

For many years, the public has used Moonstone Beach for sunbathing and swimming. Many of those using it, including members of the Association, have engaged in those activities unencumbered by bathing suits. By tacit agreement, the nudists have confined their activities to an area segregated from that frequented by their attired brethren.

In 1983, FWS became concerned that human activities on the beach might be having adverse effects upon the reproductive activities of the Least Tern and the Piping Plover. In particular, FWS feared that the activities of bathers were destroying nests, inhibiting mating, and that refuse left by bathers was attracting predators. Accordingly, FWS partitioned the westerly portion of the beach by erecting 4,000 linear feet of fence along a line parallel to and above the shoreline.

In January of 1986, FWS's concern was further heightened by the Plover's official designation as a "threatened species" under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 et seq., which required FWS to do everything in its power to protect the species. This development, together with the donation of additional beach front property to the east of Moonstone Beach Road, caused FWS to extend the fence an additional 750 feet leaving approximately 1550 feet at the east end of the beach for public use.

By 1987, FWS still was not satisfied with the balance it had attempted to strike be-

tween public enjoyment of the beach and the needs of the Plovers. That dissatisfaction was reinforced by the findings of a study conducted by the Service's Piping Plover Recovery Team to the effect that the proximity of humans interfered with the Plover's reproductive activities and that the section of Moonstone Beach still used by bathers encompassed a very desirable nesting area.

Accordingly, FWS developed a Master Plan for management of the Refuge which proposed, among other things, to further restrict public use of Moonstone Beach during the Plover's nesting season (*i.e.*, April 1—August 31). The plan also proposed breaching the sand dune between Trustom Pond and Block Island Sound to improve feeding opportunities for the Plover, removing vegetation on the back side of the dune to encourage nesting activities, constructing an artificial island in Trustom Pond to further encourage nesting, and seeking an agreement with the State of Rhode Island to prohibit public use of the intertidal zone adjacent to the Refuge during the nesting season.

A draft Environmental Assessment ("EA") outlining the anticipated environmental effects of the plan and several alternative courses of action was circulated by FWS for public comment. In January of 1988, a final environmental assessment was prepared. It discussed the comments received in response to the draft and included a finding that preparation of a full-blown Environmental Impact Statement ("EIS") was not required because the environmental effects of the proposed plan were not significant.

Several months later, FWS erected a fence excluding the public from an area extending the entire length of the beach and bounded on the South by a line ranging from 57 feet to 83 feet above the mean high-water line. Plaintiffs, thereupon, commenced this action for a declaration of their right to use Moonstone Beach and for an injunction prohibiting defendants from interfering with that right. The arguments they make in support of their position may be summarized as follows:

1. Defendants had no authority to erect the fence in question because it encompasses a portion of the intertidal zone which is owned by the State of Rhode Island and held in trust for the use of its citizens.

2. Prohibiting the plaintiffs from sunbathing nude within the fenced portion of Moonstone Beach constitutes a violation of their rights under the First, Fifth, and Ninth Amendments to the United States Constitution.

3. Defendants acted unlawfully in erecting a fence without first filing a determination, pursuant to the Coastal Zone Management Act ("CZMA"), that such action was consistent with Rhode Island's Coastal Zone Management Program.

4. Defendants acted unlawfully in erecting a fence without first filing an EIS pursuant to the National Environmental Policy Act ("NEPA").

## DISCUSSION

*Preliminary Injunction Standard*

In considering the plaintiffs' contentions, it must be remembered that what they seek, at this stage of the proceedings, is a preliminary injunction. The standard for determining whether a preliminary injunction should issue was succinctly set forth in *Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006 (1st Cir. 1981) where the Court said:

"In the First Circuit, a plaintiff must satisfy four criteria in order to be entitled to a preliminary injunction. The Court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendants; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction."

*Id.* at p. 1009.

In this case, analysis of the first two factors is relatively inconclusive but suggests that injunctive relief is inappropriate. The harm suffered by the plaintiffs in be-

ing deprived of sunbathing on a portion of Moonstone Beach may be characterized as irreparable in the sense that the enjoyment associated with that activity at that location cannot be precisely measured and, once lost, cannot be restored. However, the magnitude of that harm is diminished by the fact that the plaintiffs are being prevented from using only a portion of the beach. The evidence demonstrates that they remain free to use the 57–83 feet of beach between the fence and the high-water line which constitutes nearly one half of the beach area. In addition, they have the alternative of pursuing their activities at other beaches, though perhaps not in the nude or in surroundings that are as much to their liking.

To a lesser degree, the same may be said with respect to the injury likely to be inflicted upon the Plover. Certainly, anything that potentially inhibits the Plover's reproductive activities constitutes a threat to the bird's very survival as a species. However, the evidence shows that Moonstone Beach accounts for only an estimated 18% of the Plover's nesting activities in Rhode Island and that these migratory birds nest in other states as well. Furthermore, FWS acknowledges that, even without the proposed action, the Plovers could continue to reproduce in the Refuge though at a somewhat diminished rate. The agency is unable to quantify the differential with any degree of certainty but estimates it to be somewhere between 1–10 fledglings per year.

It is equally difficult to assess the extent to which the public interest would be adversely affected by the granting of an injunction because there are two conflicting public interests that would be affected in opposite ways. On the one hand, an injunction would have a salutary effect on the public interest in preserving public access to the coasts for recreational purposes which is recognized by both CZMA (16 U.S.C. § 1452(2)(D)) and the Rhode Island Constitution (*R.I. Const.* Art. I, § 17). On the other hand, the injunction sought would adversely affect the public interest in protecting wildlife and their habitats, in general, and threatened species, in particular,

which are also recognized by CZMA (16 U.S.C. § 1452(2)(A)) and by ESA (16 U.S.C. §§ 1531 *et seq.*).

Consequently, while the aforementioned considerations militate slightly in favor of denying an injunction, the conclusive factor appears to be whether the plaintiffs have exhibited a likelihood that they will succeed on the merits. It is that factor to which the Court will now turn its attention.

*FWS's Jurisdiction*

The plaintiffs assert that the portion of beach from which they have been barred is owned by the State of Rhode Island and held in trust for the use of its citizens pursuant to Art. I, § 17 of the Rhode Island Constitution. However, that contention is not supported by the facts.

As previously stated, the Refuge is bordered on the South by Block Island Sound. Under Rhode Island law, its boundary is the mean high-water line which is defined as the intersection of the tidal plane of mean high tide (*i.e.* the arithmetic average of the high water heights observed over an 18.6 year Metonic cycle) with the shore. *State v. Ibbison*, 448 A.2d 728, 730 (R.I. 1982). *See, Borax Consolidated Ltd. v. City of Los Angeles*, 296 U.S. 10, 22–23, 56 S.Ct. 23, 29, 80 L.Ed. 9 (1935). The lands between that line and the low-water line constitute the intertidal zone and are owned by the State of Rhode Island. *See, Phillips Petroleum Co. v. Mississippi*, —— U.S. ——, 108 S.Ct. 791, 98 L.Ed.2d 877 (1988). Under the Rhode Island Constitution, the intertidal zone is held, in trust, for the use of the people who are guaranteed, among other things, the right of passage across that area, the right of access to the shore, and the right to swim in the sea. *R.I. Const.*, Art. I, § 17; *State v. Ibbison, supra; Jackvony v. Powel,* 67 R.I. 218, 21 A.2d 554 (1941).

The uncontroverted evidence is that the fence in question ranges from distances of 57–83 feet above the mean high-water line as delineated by FWS's surveyor. While it appears that the line was based on geodetic survey information rather than on Metonic cycle data, the distance between the line

and the fence seems to afford a more than ample margin for possible error. Nor is there any suggestion that the fence impedes public access to or from the shoreline along Moonstone Beach Road. In fact, FWS's own environmental assessment acknowledges its lack of authority to prevent public use of the intertidal zone adjacent to the Refuge or to impede access along the right-of-way. Consequently, it appears that the fenced area is clearly on federally owned property; and, therefore, plaintiffs' assertion that FWS lacks dominion over it is without merit.

*The Constitutional Claims*

■ The plaintiffs' Constitutional arguments are difficult to address because the nature of the rights they assert is not precisely defined. The gist of their contention seems to be that since they used the portion of Moonstone Beach in question in the past; and, since they gathered there to share their common interest in nudism, their activities constitute an exercise of their associational and property rights which are protected by the First Amendment and the due process guarantee of the Fifth Amendment. The applicability of the Ninth Amendment is more difficult to discern. The plaintiffs have failed to articulate any basis for bringing their conduct under the protective umbrella of that Amendment nor have they cited any authority holding that nude sunbathing, particularly on a public beach, is one of the rights contemplated by it.[1]

The case law on this subject has uniformly rejected arguments that nude sunbathing on a public beach is Constitutionally protected either as a mode of expression, *South Florida Free Beaches Inc. v. City of Miami,* 734 F.2d 608, 610–611 (11th Cir. 1984); as a form of association, *Chapin v. Town of Southhampton,* 457 F.Supp. 1170, 1175 (E.D.N.Y.1978), or as a privacy right, *Chapin, supra.* In short, while nudity in the privacy of one's own property and nudi-

ty in the context of artistic expression may be protected, it seems clear that nude sunbathing on a public beach is not a right of Constitutional dimension.

It is even clearer that nudity does not confer a license to sunbathe on a beach that has been closed to the public. In this case, it is not nude sunbathing that has been banned on Moonstone Beach. What has been prohibited is *any* use of the disputed area. The uncontradicted evidence is that the prohibition has been applied uniformly both to those wearing bathing suits and to nudists. There is no evidence even remotely suggesting that defendants' actions were aimed directly or indirectly at nudists. In fact, the evidence establishes that plaintiffs remain free to associate and sunbathe on the portion of the Refuge beach that has not been fenced.

Consequently, the issue in this case is not whether the plaintiffs have a Constitutionally protected right to sunbathe in the nude or to associate with other nudists but rather whether they have a Constitutionally protected right to do so *on that portion of the beach from which the public, in general, has been excluded.* In answering that question, the plaintiffs cannot be considered as standing on any different footing than any other members of the public. The fact that some of the plaintiffs prefer to sunbathe in the nude or associate with others sharing that preference doesn't confer on them any greater right to use the beach than those who choose to wear bathing suits. The question, in either case, is whether the defendants' actions have deprived sunbathers, in general, of a legally recognized right to use the area in question.

The plaintiffs are unable to identify any such right. They cite the fact that they have used Moonstone "since time immemorial" but fail to demonstrate any legal right flowing from such past use. Plaintiffs also

---

1. In *Williams v. Kleppe,* 539 F.2d 803 (1st Cir. 1976), the Court assumed *arguendo* that such activity was afforded some measure of substantive Constitutional protection but concluded that it was certainly not a fundamental right requiring application of the strict scrutiny test.

The Court proceeded to uphold a regulation banning nude bathing at the Cape Cod National Seashore on the ground that the regulation bore a rational relationship to the objectives of the seashore.

assert that Art. I, § 17 of the Rhode Island Constitution confers on them a right to use the area in question. However, as previously noted, that right extends only to the area below the mean high-tide line and recognized points of access thereto. The area from which these plaintiffs have been excluded fits neither description. Moreover, it is part of a federal wildlife refuge and the reason for excluding them is FWS's belief that such action is necessary to preserve the nesting habitat of a threatened species that ESA requires them to do everything in their power to protect.

■ There is certainly some room for disagreement as to whether the measures adopted by FWS strike a perfect balance between the competing interests of sunbathers and Plovers. Nevertheless, as long as the agency's action was not irrational or was not arbitrary, capricious or an abuse of its discretion, that is a determination for the agency to make. Here, the Court cannot characterize the defendants' actions as any of those things. While FWS cannot guarantee that those actions will increase the number of Plovers, it concluded, after considerable study, that its action would significantly improve conditions by increasing the nesting area and reducing human interference with the reproductive process. Further, FWS estimates that such action would increase the birth rate of young Plovers from 3–4 to 3–14 annually.

In sum, the Court finds that barring the plaintiffs from the area in question has not infringed upon any associational right, property right or other Constitutionally recognized right secured to them by the First, Fifth, and/or Ninth Amendments and it was not arbitrary, capricious or an abuse of FWS's discretion.

*Failure to File a Consistency Determination*

■ A much more troublesome question is whether CZMA required FWS to file a determination that its proposed action was consistent with Rhode Island's Coastal Zone Management Program.

CZMA emanated from Congress' recognition that "... increasing and competing demands upon the lands and waters of our coastal zone ... have resulted in the loss of ... wildlife, ... decreasing open space for public use, and shoreline erosion." 16 U.S.C. § 1451(c). Among its objectives are the protection of "wildlife and their habitat" and provision for "public access to the coasts for recreation purposes." 16 U.S.C. § 1452(2)(A), (C). To achieve those purposes, the Act includes a variety of provisions designed to encourage the states to develop coastal zone management programs and to promote cooperation between federal and state agencies engaged in programs affecting the coastal zone. In an effort to reconcile the potentially conflicting state and federal interests involved, the Act requires federal agencies engaging in activities within a coastal zone to take cognizance of any applicable state plan that has been approved by the Secretary of Commerce. Rhode Island is one of those states having an approved state management program. *See,* 52 Fed.Reg. (No. 146) 28477–28478 (July 30, 1987). Specifically, § 307(c)(1) provides:

"Each Federal agency conducting or supporting activities *directly affecting* the *coastal zone* shall conduct or support those activities in a manner which is, to the maximum extent practicable, consistent with approved state management programs."

16 U.S.C. § 1456(c)(1) (1982 ed.) [emphasis added].

The Secretary of Commerce has promulgated detailed regulations governing the procedures to be followed in effecting that accommodation. The regulations require federal agencies engaging in planning or construction activities which directly affect the coastal zone of a state having an approved management plan to provide the state with a detailed description of the activity and its anticipated effects on the coastal zone together with a brief statement indicating whether or not the proposed activity will be undertaken in a manner consistent, to the maximum extent practicable, with the state's management program. *See,* 15 C.F.R. §§ 930.31, 930.33, and 930.34. Among the factors to be considered by the agency is the impact its actions will have on beach access. 15 C.F. R. § 930.39(b).

The regulations further mandate that the consistency determination be provided before the agency reaches a decision and at least 90 days prior to final approval of the proposed activity unless the agency and the state agree otherwise. 15 C.F.R. § 930.34(b). They also provide a comprehensive procedure by which the state may communicate its disagreement with a consistency determination and seek mediation by the Secretary if the disagreement remains unresolved. 15 C.F.R. § 930.41–930.44.

In this case, there is no question that FWS failed to file a determination that its proposed action was consistent with Rhode Island's program. The agency rather lamely claims that a letter it received from the Division of Fish and Wildlife of the State's Department of Environmental Management expressing support for the proposed action constituted an agreement within the meaning of the regulations. That contention overlooks the fact that no document meeting the requirements of a consistency determination was ever filed. Even more significantly, it ignores the fact that the Rhode Island Coastal Resources Management Council, the state agency with primary responsibility for administering the program, specifically requested that a certificate of consistency be filed.

Given the failure to file a consistency determination, the question becomes whether such a filing was required. As previously noted, CZMA § 307(c)(1) and the pertinent regulations require a federal agency to submit a consistency determination only with respect to activities "directly affecting the coastal zone." In defining the "coastal zone," the Act specifically excludes lands held in trust by the federal government. Thus, it provides, in relevant part, that:

"... Excluded from the coastal zone are lands the use of which is by law subject solely to the discretion of or which is held in trust by the federal government, its officers or agents."

16 U.S.C. § 1453(1).

FWS contends that, since the fence in question is located within the boundaries of the Refuge held in trust by the federal government, it is outside of the coastal zone. Therefore, it concludes that no consistency determination was required. While the premises of that argument are correct, the conclusion does not necessarily follow. The mandate of CZMA § 307(c)(1) applies not only to federal activities *within* the coastal zone but also to activities *directly affecting* it. As noted by the United States Supreme Court, the legislative history of CZMA indicates that these words were inserted as a compromise between the House bill, which included federally controlled lands within the definition of the "coastal zone" thereby subjecting all activities on those lands to the consistency requirement, and the Senate bill, which excluded federally controlled lands from the definition of the "coastal zone" thereby totally exempting activities on those lands from that requirement. Consequently, the words "directly affecting" were intended to require that activities conducted on land under federal jurisdiction be consistent with state management plans, but only if those activities impact other areas within the coastal zone. *Secretary of the Interior v. California*, 464 U.S. 312, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984).

In this case, it is at least arguable that some of the proposed actions described in FWS's Master Plan may have direct effects extending beyond the boundaries of the Refuge and into the coastal zone. Thus, it is conceivable that the experimental removal of vegetation or the creation of an artificial island in Trustom Pond might impact the area surrounding the Refuge. Indeed, it is difficult to see how the breach of Trustom Pond can be accomplished without physically intruding upon and altering the intertidal zone through which sea water will presumably ebb and flow.

However, it is not those proposed actions that are being challenged. What is being challenged is the erection of a fence and the question presented by that challenge is whether that fence "directly affects the coastal zone." The record is totally devoid

of even a suggestion that the fence has any environmental effect. On the contrary, the EA specifically states that the fence was designed so as not to promote artificial dune formation. Furthermore, as previously stated, the evidence establishes that the fence is well above the mean high-tide line and does not impinge on any legally recognized right the plaintiffs may have to reach and use the intertidal zone.

The only effect of the fence cited by the plaintiffs is that it prevents them from using the remaining portion of the beach for sunbathing. That restriction certainly affects the plaintiffs and the activities they desire to engage in on the Refuge property. It even might be viewed as affecting the Refuge property itself. However, it clearly does not affect the area outside the Refuge constituting the coastal zone. Consequently, no consistency determination was required with respect to action barring plaintiffs from the disputed portion of Moonstone Beach.

*Need for Environmental Impact Statement*

■ Section 102(2)(C) of the National Environmental Policy Act requires federal agencies proposing "major Federal actions significantly affecting the quality of the human environment" to prepare a detailed statement regarding the environmental impact of the proposed action and alternatives to it. 42 U.S.C. § 4332(2)(C).

Regulations promulgated by the Council on Environmental Quality require that the agency first prepare an environmental assessment identifying the environmental effects of the proposed action. The principal purpose of the EA is to help determine whether the effects are "significant" enough to trigger the obligation to file a full-fledged EIS. 40 C.F.R. §§ 1501.3, 1501.4, 1508.9, and 1508.27 (1984).

Thus, an EA is not a substitute for an EIS; but, rather, is a means for determining whether an EIS is required. The distinction between the two documents was aptly described in *Sierra Club v. Marsh*, 769 F.2d 868 (1st Cir.1985) where the Court said:

"An EA aims simply to identify (and assess the 'significance' of) potential impacts on the environment; it does not balance different kinds of positive and negative environmental effects, one against the other; nor does it weigh negative environmental impacts against a project's other objectives ... [t]his latter balancing job belongs to the officials who decide whether to approve the project; and (where there are 'significant effects') those officials should make the decision in light of an EIS ... The purpose of an EA is simply to help the agencies decide if an EIS is needed."

*Id.* at p. 875.

If, based upon the EA, the agency concludes that its proposed action will have no "significant" environmental effects, it must submit a finding so stating which is known in the vernacular as a FONSI (finding of no significant impact). In this case, as already noted, FWS did prepare a reasonably detailed EA from which it concluded that the environmental effects of its proposed actions were not significant enough to require preparation of an EIS. Accordingly, a FONSI was filed.

The plaintiffs make the naked assertion that depriving them of the opportunity to sunbathe on a portion of the beach does constitute an action "significantly affecting the quality of the human environment." This contention fails to recognize the distinction between actions affecting the property and ecosystems comprising the Refuge and actions affecting the activities that may be conducted there. It confuses actions affecting the environment itself with actions affecting activities conducted within the environment. Generally speaking, NEPA's requirement of an environmental impact statement is triggered by the former but not by the latter.

It is conceivable that there could be situations in which action affecting activities conducted within the environment indirectly and adversely affect the environment itself. However, this clearly is not one of those situations. Barring the plaintiffs from Moonstone Beach obviously has no adverse effect on the beach. If anything,

it would be beneficial since the evidence shows that human activities inhibited reproduction of the wildlife inhabiting the Refuge and sometimes resulted in the leaving of refuse.

In short, while FWS's actions have clearly affected plaintiffs' sunbathing activities on Moonstone Beach and while the reasonableness of those actions may be debated, they do not result in the kind of environmental impact that requires the preparation of an EIS.

## CONCLUSION

Since the plaintiffs have failed to demonstrate a likelihood of success on the merits of their claim and since the injury that the plaintiffs will suffer if an injunction is withheld does not outweigh the injury that would likely be inflicted if an injunction is granted, the request for a preliminary injunction is hereby denied.

IT IS SO ORDERED.