Julio QUINONEZ–LOPEZ, et al.,
Plaintiffs, Appellants,

v.

COCO LAGOON DEVELOPMENT
CORPORATION, et al.,
Defendants, Appellees.

No. 83–1353.

United States Court of Appeals,
First Circuit.

Argued Feb. 6, 1984.

Decided April 26, 1984.

Armando Cardona Acaba, Bayamon, P.R., with whom Gretchen Coll Marti, Santurce, P.R., Pedro J. Saade Llorens, Hato Rey, P.R., Josefina Pantoja Oquendo, Rio Piedras, P.R., Luis Amauri Suarez Zayas, Maria Dolores Fernos, Hato Rey, P.R., Jose E. Colon Santana, and Emmalind Garcia Garcia, Rio Piedras, P.R., were on brief, for appellants.

Martin W. Matzen, Atty., Dept. of Justice, Washington, D.C., with whom F. Henry Habicht, II, Asst. Atty. Gen., Washington, D.C., Daniel F. Lopez-Romo, U.S. Atty., Francisco A. Besosa, Asst. U.S. Atty., San Juan, P.R., and Anne S. Almy, Atty., Dept. of Justice, Washington, D.C., were on brief, for federal appellees.

Steven C. Lausell, San Juan, P.R., with whom Jimenez & Fuste, San Juan, P.R., was on brief, for Coco Lagoon Development Corp., Coco Beach Estates, Inc., and Arturo Diaz, its President.

Before CAMPBELL, Chief Judge, WISDOM,* Senior Circuit Judge, and BREYER, Circuit Judge.

BREYER, Circuit Judge.

This case concerns the validity of the Corps of Engineers' decision to grant Coco Lagoon Development Corp. ("CLDC") a permit to fill a wetland area for the construction of housing on the northern coast

* Of the Fifth Circuit, sitting by designation.

of Puerto Rico. The Corps granted the permit on the basis of an "Environmental Assessment." It concluded that the filling project would have no significant adverse environmental impact. Thus, there was no need to go further and prepare a full environmental impact statement ("EIS"). *See* 42 U.S.C. § 4332(C) (EIS required only for "major Federal actions significantly affecting the quality of the human environment"). Appellants challenge this "Finding of No Significant Impact." We affirm the district court's dismissal of that challenge.

Twenty years ago, the area in question was a mangrove forest, a type of environment that all the parties acknowledge to be a valuable and productive wetland. In the late 1960's, before enactment of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, CLDC deposited large volumes of fill in the area, destroying the mangroves in all but one corner of the property. No one challenges the propriety of this pre-NEPA activity. In at least a sizeable portion of the filled area, however, insufficient fill was deposited to create permanently dry land; this portion continued to support some types of wetland vegetation. Any *further* filling activity affecting this "secondary wetland" portion of the area (and any affecting the remaining mangrove areas) requires a Corps permit, *see* 33 U.S.C. §§ 1344, 1362(7), and the issuance of a Corps permit is now subject to NEPA.

In the late 1970's, CLDC resumed filling activity at the site, without seeking permission from the Corps. It deposited a 250 foot square "pad" of fill in a wetland clearing in the remaining mangrove area, to provide a location for a "sanitary treatment plant." It also resumed filling in the "secondary wetland" area. In January 1980 the Corps issued a cease and desist order, telling CLDC to stop these activities unless and until it obtained an appropriate permit. CLDC applied for the permit, and it entered into negotiations with the Corps concerning the permissible scope of filling in the area. Various federal and Commonwealth agencies studied the site and the proposals, of-

fered their opinions, and participated in the negotiations between the Corps and CLDC. As a result of these negotiations, CLDC agreed to remove the fill it had placed in the mangrove clearing and to relocate the treatment plant away from the surviving mangrove area. It also agreed that, if the Corps permitted it to continue to fill the 100 or so acres of "secondary wetlands," it would create a new 30-acre mangrove forest elsewhere on its property, to compensate for the lost wetlands. The Corps granted the permit, with these conditions. It also issued an environmental evaluation concluding that the area to be filled was of marginal environmental value; that, in light of the agreement to create a more valuable mangrove area, the "net environmental impact of the issuance of the permit is positive;" and that an environmental impact statement was therefore unnecessary. It is these conclusions that appellants challenge here.

■ The critical determination of the Corps here under review is that there is no substantial possibility that CLDC's permitted activities could significantly affect the quality of the human environment. *Cf. Winnebago Tribe v. Ray*, 621 F.2d 269, 271 (8th Cir.) (party challenging decision not to prepare EIS bears burden of establishing substantial possibility that agency action "could significantly affect the quality of the human environment") (quoting *Minnesota Public Interest Research Group v. Butz*, 498 F.2d 1314, 1320 (8th Cir.1974)), *cert. denied*, 449 U.S. 836, 101 S.Ct. 110, 66 L.Ed.2d 43 (1980); *Maryland-National Capital Park & Planning Commission v. United States Postal Service*, 487 F.2d 1029, 1039–40 (D.C.Cir.1973) (EIS unnecessary only when "potential impacts are truly insignificant"). Appellants must show the Corps' determination to be "arbitrary, capricious, an abuse of discretion," 5 U.S.C. § 706(2)(A); in essence, they must seek to show that, in light of the factual circumstances, the Corps' decision was unreasonable. *See, e.g., National Wildlife Federation v. Appalachian Regional Commission*, 677 F.2d 883, 889 (D.C.Cir.1981);

*Committee for Auto Responsibility v. Solomon,* 603 F.2d 992, 1002 (D.C.Cir.1979), *cert. denied,* 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980).

Different courts have urged different degrees of "judicial scrutiny" of the underlying record in cases like this one. *Compare, e.g., City of Davis v. Coleman,* 521 F.2d 661, 673–74 (9th Cir.1975) (relatively searching review of "reasonableness") *and Save Our Ten Acres v. Kreger,* 472 F.2d 463, 466–67 (5th Cir.1973) (same) *with, e.g., First National Bank of Chicago v. Richardson,* 484 F.2d 1369, 1381 (7th Cir.1973) (more deferential "arbitrary or capricious" standard) *and Hanly v. Kleindienst,* 471 F.2d 823, 828–29 (2d Cir.1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973) (similar); *see generally Township of Lower Alloways Creek v. Public Service Electric & Gas Co.,* 687 F.2d 732, 741–42 (3rd Cir.1982) (comparing two approaches); Shea, *The Judicial Standard for Review of Environmental Impact Statement Threshold Decisions,* 9 B.C.Envtl.Aff.L. Rev. 63 (1980). And they have used various legal formulae to describe the standard of review. We need not enter the luxuriant jungle of differing review descriptions here, however, for the Corps decision is sufficiently well-supported to withstand even strict judicial scrutiny.

■ We note at the outset that the Corps' geographical determination—picking out the 100 acres of secondary wetlands over which it retained jurisdiction—has adequate support. Corps scientists examined the area in 1979 and 1980 to delineate the jurisdictional area and based their conclusions on observed vegetation on the site. Appellants have presented us with no record evidence casting doubt on the accuracy of the Corps' findings. Similarly, appellants cannot seriously attack the Corps' decisions in respect to the remaining mangrove areas. The Corps required that CLDC remove the one "pad" of fill in the vicinity of the surviving stand of mangroves, before it would allow continued filling elsewhere on the site. And no one has argued that the resumed filling elsewhere on the site will have any deleterious effects on the mangrove areas.

The issue on which appellants must rely concerns the environmental value of the "secondary wetlands." The Corps, along with other federal and commonwealth agencies, thoroughly studied the affected area. Staff of at least five governmental agencies visited the site to assess the likely environmental impact of filling. The agencies' staffs met with each other and prepared reports. The consensus of the agencies was that the secondary wetlands were of so little environmental value that permitting their destruction was cause for no concern. The United States Environmental Protection Agency described the area as "of poor quality" and concluded that restoration efforts were not warranted. The Commonwealth Environmental Quality Board described the area as "of little or no ecologic importance." And the Commonwealth Department of Natural Resources characterized it as "marginal and of poor quality." The federal Fish and Wildlife Service focused its attention on the serious detrimental effects of the activity in the mangrove forest, but concluded that as long as that area was not affected, the remaining work could safely proceed.

Appellants' efforts to rebut these appraisals focus on certain preliminary staff reports, which, they say, show that the agencies' conclusions fail to reflect the true facts. In particular, they point to a staff report of the National Marine Fisheries Service and to a report of the Corps' own biologist; these documents, they claim, establish the environmental significance of the affected area. Our review of the materials in the record reflecting the views of these two agencies convinces us, however, that these reports cannot support a conclusion that the secondary wetlands were of significant ecological value.

Robert Pace, the Corps' biologist, visited the site on at least two occasions in late 1979. In his report of January 1980 he described the "Effects of Violation upon Environment" as follows:

Destruction of a mangrove forest and a freshwater marsh has eliminated a wildlife habitat, affected drainage patterns and areas receiving flood waters, affected water quality by eliminating a natural filtration area, and has possible detrimental effect on sedimentation over adjacent reefs and marine fishery productivity.

This passage casts little or no light on the impact of the destruction of the secondary wetlands; for, it describes the effects of the *prior* destruction of the mangrove forest, a matter that is not in dispute here. At the time of Mr. Pace's visits, the Corps may not have been aware of the relevant chronology. In any case, there is no conflict between the report and the Corps' later characterization of the area—in its contemporary condition—as "marginally valuable wetlands."

The National Marine Fisheries Service study also initially focused on the effects of the entire long-term filling project. It also described the effects of the entire project in troubling terms:

132 acres of mangroves and saline, brackish, and freshwater marsh have been filled for roads, housing development, drainage ditches, and a sewage treatment plant. Runoff from the project is also impacting seagrasses and coral reefs. Loss of this habitat removes sources of detritus, filtration of land and waterborne pollutants, and generally diminishes the marine and estuarine systems' capability to produce fishes and invertebrates of commercial and recreational importance.

But again it is clear that this assessment concerns the project *as a whole*, including the pre-NEPA destruction of the mangroves and the current filling within the remaining mangrove area for the sewage treatment plant. The Fisheries Service played an active role in the subsequent discussions concerning the project. When, in the course of the negotiations, attention focused on the significance of the wetlands in their present condition, the Service's representative characterized the secondary wetlands as having a "productivity value" of 1, on a scale where 0 represented totally unproductive wetland and 5 represented the most productive mangrove wetlands. Thus, the Fisheries Service's position also does not cast doubt on the Corps' conclusion. All the concerned agencies appear to have agreed that the secondary wetlands were of very little environmental value, and nothing in the record before us contradicts this consensus.

Under these circumstances, we find no basis for questioning the reasonableness of the Corps' determination that the filling activity covered by the permit it issued would cause no significant environmental damage. Its conclusion is not arbitrary or capricious. Hence, the decision of the district court dismissing the complaint is

*Affirmed.*