**UNITED STATES of America, et al., Plaintiffs, Appellees,**

v.

**METROPOLITAN DISTRICT COMMIS-SION, et al., Defendants, Appellants.**

No. 91–1337.

United States Court of Appeals, First Circuit.

Heard April 16, 1991.

Decided April 22, 1991.

Douglas H. Wilkins, Asst. Atty. Gen., with whom Scott Harshbarger, Atty. Gen., was on motion for a stay pending appeal and memorandum in support thereof.

George B. Henderson, II, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., and Jeffry Fowley, Associate Regional Counsel for Water, were on memorandum in opposition to motion for a stay for appellee, U.S.E.P.A.

John M. Stevens, with whom Foley, Hoag & Eliot, Catherine L. Farrell, Gen. Counsel, Steven H. Goldberg, Associate Gen. Counsel, and Virginia S. Renick, Sr. Staff Counsel, were on memorandum for Massachusetts Water Resources Authority.

Before BREYER, Chief Judge, TORRUELLA and CYR, Circuit Judges.

BREYER, Chief Judge.

On February 25, 1991, the district court entered an order in the Boston Harbor Clean-up case that, in effect, says that the Commonwealth 1) must give the Massachusetts Water Resources Authority (MWRA) the power "to acquire a ... suitable ... landfill" site, and 2) may not hook up any new sewer lines emptying into Boston Harbor until it does so. The Commonwealth appeals, arguing that the order (along with the court's April 5 refusal to modify the order) is unreasonable. For that reason, it says, the court's actions are unlawful. We have expedited proceedings in the appeal. After holding oral argument, reading the briefs, and examining the record, we decide that the orders are reasonable and, consequently, lawful. We therefore affirm the orders and deny, as moot, the Commonwealth's motion for a stay pending appeal.

## I

### Background

To appreciate the basis for the district court's orders, and for other reasons, the reader must understand something of the history of this case. We have set out a chronology of the case in an Appendix. We shall summarize the key matters that the chronology reveals.

1) The Commonwealth, for more than fourteen years, has unlawfully discharged sewage into Boston Harbor, in violation of the Federal Clean Water Act. 33 U.S.C. §§ 1251 *et seq.* The Conservation Law Foundation, in 1983, and the United States, in 1985, brought separate suits (later consolidated) to stop this discharge. On September 5, 1985, the district court found that the Commonwealth was guilty of "persistent and severe violations of the Act." *United States v. Metropolitan District Commission*, 23 Env't.Rep.Cas. (BNA) 1350, 1358, 1985 WL 9071 (D.Mass.1985).

2) The district court, in developing a remedy for the violations of law, did not enjoin the further discharge of pollutants, although the statute made this remedy available. *See* 33 U.S.C. § 1342(h) (authorizing ban on new sewer hook-ups). Rather, together with the parties, the court developed a 15–year Compliance Plan. The Plan calls for the construction, by December 1999, of a new $6 billion sewage treatment system for the metropolitan Boston area. The detailed remedial schedule contains specific deadlines for the building and opening of numerous facilities. Among other things, it requires that the MWRA build a plant that will turn sludge into fertilizer, which it may then sell. It also requires construction of a "landfill" to hold grit and sediment, as well as any sludge that is not sold as fertilizer. The MWRA is to oversee, and to implement, the plan.

3) The landfill is a key element of the remedial program. The plan requires the MWRA to prepare a final landfill design by November 1991, to begin construction by September 1992, and to commence operation of the landfill (in coordination with the opening of a new sludge-into-fertilizer plant) by March 1994.

4) In 1986, the MWRA began a five-year effort to find a suitable landfill location. It surveyed 299 potential sites and eventually narrowed the number to two: Walpole, the preferred site, and Rowe Quarry in Malden/Revere. By late 1990 and early 1991, the MWRA had obtained all needed environmental approvals, and all other necessary action from various state and federal agencies, with respect to the Walpole site, with one exception (discussed in the next paragraph). The MWRA so far has spent $10 million on this site-selection process.

5) Under state law, the state legislature must approve any transfer of the Walpole site to the MWRA from its current owner, the Department of Correction. *See, e.g.,* Mass.Gen.Laws ch. 7, §§ 40E–40J. In December 1990, the legislature voted not to approve a bill that would have given the MWRA the authority needed to obtain the site. Thus, as far as state law is concerned, the MWRA cannot begin to build the needed landfill at Walpole or anywhere else.

6) Ever since May 1989, when the MWRA designated its landfill alternatives, the court has pointed out that timely acquisition of a site is essential. In July 1990, when the legislature deferred action on the necessary legislation for six months, the court expressly warned that it might have to forbid additional new sewer discharges into the harbor, in order to avoid jeopardizing the schedule, and (in the absence of scheduling certainty) to prevent added pollution. In December 1990, in response to the legislature's rejection of a transfer bill, the United States asked the court 1) to order the transfer of the Walpole site to the MWRA directly, and to enjoin enforcement of state law to the contrary; 2) to order the Commonwealth to approve the transfer itself; or 3) to order the Commonwealth not to connect new sewer hook-ups to the Harbor discharge system until the MWRA had authority to acquire a suitable landfill site. The court chose this last option, entering its "ban or transfer" order on February 25, 1991.

7) On April 1, 1991, the Commonwealth established a Commission to look for alternative landfill sites. The Commission is to report within 120 days. If the Commission finds an alternative site, the Commonwealth says it will submit that site to the court for approval. If the court rejects the alternative site, or if the Commission finds none within 120 days, the Commonwealth promises to pursue a plan to lease the Walpole site to the MWRA for 28 years, and to use its best efforts to obtain legislative approval for such a lease.

8) On April 2, 1991, the Commonwealth asked the district court to modify its order, suspending the sewer hook-up ban, pending receipt of the Commission's report. On April 5, the district court denied the Commonwealth's motion. The Commonwealth now appeals both the February 25 order and the April 5 refusal to modify.

## II

### *Reasonableness*

The Commonwealth agrees with the propositions set forth above. It concedes that a landfill site is needed, and that its timely acquisition is critical if the Commonwealth is to meet the court's schedule and comply with the law. The Commonwealth also told the district court, on April 5, 1991, that "the only site we know of today that we know will meet the schedule" is Walpole. But, it says, the newly elected State Administration should have 120 days to find an alternative site; in the meantime, in the Commonwealth's view, the MWRA should remain *without the authority* to use state land or acquire other land by eminent domain in order to obtain a suitable site. And, the Commonwealth adds, it is unreasonable for the district court to order the contrary—in particular, to force a change in state law (giving the MWRA a site, or site-acquisition power) through the use of so serious a sanction (a prohibition of new sewer connections).

After reviewing the law, the record, and the arguments, we agree with the United States that the district court acted lawfully in imposing a ban on new sewer hook-ups until the MWRA receives site-acquisition authority. For one thing, the law sets forth applicable standards that limit the scope of our review, thereby favoring the federal government's position and disfavoring that of the Commonwealth. The law confers broad legal authority upon a *district* court to choose appropriate remedies for violation of the Clean Water Act. *See Weinberger v. Romero–Barcelo*, 456 U.S. 305, 316, 320, 102 S.Ct. 1798, 1805, 1807, 72 L.Ed.2d 91 (1982) (Act "contemplates the exercise of discretion and balancing of equities" and permits district court "to order that relief it considers necessary to secure prompt compliance with the Act"). We determine only whether the district court acted outside that authority, *id.* at 320, 102 S.Ct. at 1807 (proper standard for appellate review of equitable relief is "whether the District Court abused its discretion")—*i.e.*, whether, in "tailoring" the remedy to the violation, *see Dayton Board of Education v. Brinkman*, 433 U.S. 406, 420, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851 (1977), it acted unfairly, *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 31, 91 S.Ct. 1267, 1283, 28 L.Ed.2d 554 (1971), or otherwise abused the "breadth and flexibility [that] are inherent in equitable remedies." *Id.* at 15, 91 S.Ct. at 1275, *quoted in Rizzo v. Goode*, 423 U.S. 362, 376–77, 96 S.Ct. 598, 606–07, 46 L.Ed.2d 561 (1976); *see also Swann*, 402 U.S. at 31, 91 S.Ct. at 1283 ("words are poor instruments to convey the sense of basic fairness inherent in equity"). We have said that we shall set aside a district court's choice of such remedies "only if we are left with a firm conviction that it has committed 'a meaningful error in judgment.'" *Rosario–Torres v. Hernandez–Colon*, 889 F.2d 314, 323 (1st Cir. 1989) (quoting *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 923 (1st Cir.1988)). And, we must make this determination fully aware both that the district court is more familiar with the need for, and workings of, a complex relief plan such as this one, and that the district court, not this court, has ongoing responsibility for direct supervision of the creation, implementation, and possible modification of such a plan.

For another thing, the reasonableness of the district court's order finds strong support in the history of the case. The record indicates that the Commonwealth's violations of the Clean Water Act—its pollution of Boston Harbor—are serious and continuing. The complex, agreed-upon remedial plan to bring the Commonwealth into compliance with federal law has taken many years to develop, involves massive financial expenditure, depends for its success upon careful coordination of many different projects to be designed, built, and opened according to detailed, interlocking time schedules, and, in particular, requires the opening of a landfill site by March 1994. It has taken five years, and $10 million, for the MWRA to select, and to obtain most approvals for, Walpole. If Walpole is to be the site, the MWRA must complete its design by November of this year and begin construction by September 1992. The Commonwealth's refusal to transfer to the MWRA authority to acquire Walpole or any other site threatens the time-schedule and the remedial plan itself. And, any serious delay in the implementation of the plan threatens prolonged damage to the Harbor and the environment. Given these features of the case, it seems reasonable for the district court to order the Commonwealth either, in effect, to guarantee the time-schedule by transferring site acquisition authority to the MWRA, *or*, if it is unwilling to do so, to take very serious steps to cut the flow of pollution to the Harbor, steps that the statute itself specifically authorizes. *See* 33 U.S.C. § 1342(h) (authorizing ban on new sewer hook-ups).

Finally, the Commonwealth's four basic arguments to the contrary are not convincing. First, the Commonwealth says the court has no need to enter its order because a new Administration has created a Commission that will look for alternative sites and either propose an alternative or confirm Walpole within the next four months. The district court might reason-

ably conclude, however, that, in light of the many years and considerable expenditure required to find, and to obtain approvals for, the Walpole site, it will prove quite difficult, within the next four months, to find an alternative site—a site that the MWRA would have to acquire, obtain necessary approvals for, and then design, all so that construction could begin within eighteen months. The court could reasonably be skeptical that the Commonwealth will be able to repeat in four months a process that took the MWRA five years. It might therefore reasonably believe that, to maintain the time-schedule, the MWRA will need the authority to acquire Walpole, or some other "suitable site," in the near future. (And, past experience suggests that the effort to obtain authority for the MWRA to acquire any site may prove time-consuming.)

Second, the Commonwealth argues that the court's orders are, at least, premature. It points out that construction need not start at Walpole for seventeen months. Why not wait, it asks, to see what the Commission comes up with in the next four months? If the Commission fails to find a superior, less controversial alternative, the court then could enter an order like the one it has entered now.

The district court, however, fully aware of the controversies surrounding the selection of the Walpole site (and likely to surround the selection of any alternative site), could reasonably conclude that delay may mean continued turmoil, as each community, sympathetic to the Clean Water Act's environmental goals, but unwilling to provide a home for the landfill, tries harder to force the landfill somewhere else. And, it could believe that continued controversy provides all the more reason to *guarantee* the integrity of the time-schedule by insisting upon an imminent transfer of suitable site-acquisition authority. Indeed, the MWRA has told us that, because it does not own the Walpole site, it has found it difficult to obtain access to the site, and it will therefore miss its design deadline by three months. Such a delay exemplifies the type of last-minute problem that can arise in trying to design, and to build,

highly complex and controversial projects, particularly where whole communities are affected. And, it underlines the reasonableness of the district court's judgment that failure to transfer site-acquisition authority in the near future would threaten the time-schedule. To put this conclusion in terms of the appropriate legal standard: we cannot say, in respect to the sensitive, but highly circumstance-specific, matter of timing of the court's order, that the district court's decision was unreasonable, or outside its broad legal authority.

■ Third, the Commonwealth argues that the court's order, in a sense compelling the legislative branch of government to transfer legal authority to an agency, intrudes too deeply into state affairs, without appropriate concern for considerations of "comity" or "federalism." And it adds that, by ordering such an intrusive remedy, the district court violated the equitable principle that it use "the least possible power adequate to the end proposed." *Spallone v. United States*, 493 U.S. 265, 110 S.Ct. 625, 635, 107 L.Ed.2d 644 (1990) (review of contempt sanctions). Considerations of comity and federalism, however, do not give a state the legal power to violate federal law, to continue violations that have taken place over a fifteen-year period, or to place at risk a major compliance plan the very purpose of which is to reflect important state needs and interests by bringing the state into compliance only gradually, over time. Moreover, the orders at issue seem designed specifically to reflect considerations of "comity," to respect state interests in several important ways. They leave to the state the freedom to look for alternative sites, while simultaneously safeguarding the remedial time-schedule only by insisting that the MWRA have authority to obtain a "suitable" site. As a matter of form, they do not order the state legislature directly to take specific action; rather, they give the Commonwealth the choice *either* of eliminating the time-schedule risk *or* of banning new sewer connections. And, they interfere less directly with state sovereignty than would an order of the sort the United States initially

sought—one directly ordering transfer of the Walpole site. *See generally Missouri v. Jenkins,* —— U.S. ——, 110 S.Ct. 1651, 1663–66, 109 L.Ed.2d 31 (1990). We cannot say that the district court intruded into areas of state concern beyond what it might reasonably have thought necessary in the circumstances. Given this conclusion, and our earlier discussion, we do not think that *Spallone* (even assuming, purely for the sake of argument, that it applies outside the contempt context) compels a different result.

Fourth, the Commonwealth argues that the court's refusal to delay its order for four months is unreasonable given the serious harm that a moratorium on new sewer connections may cause. We agree that such a moratorium, especially if continued for many months, could cause harm (which harm Congress took into account when it specifically authorized courts to impose such a remedy). But the court's order does not create such harm, for it does not insist upon the sewer moratorium. Rather, the order requires the Commonwealth to transfer site-acquisition authority to the MWRA. It foresees maintenance of the ban only if the Commonwealth fails to take this step, and only in that instance as a necessary means to help stop continued harbor pollution. The harm that the Commonwealth may suffer as a result of the sewer moratorium, then, would seem self-inflicted.

In sum, the Commonwealth's arguments prove too little. They show, at most, that the district court *might* have chosen other ways to resolve the problem facing it. They do not show that the remedy that the United States requested and the court adopted is itself unreasonable, or that it for any other reason exceeds the broad scope of the court's remedial power. We find no abuse of discretion either in the district court's initial decision to impose a ban on sewer hook-ups, or in its subsequent refusal to suspend the ban for four months while the Commonwealth searches for an alternative landfill site. Consequently, the orders of the district court are

*Affirmed.*

*The motion for stay is denied as moot.*

## APPENDIX

The following chronology sets forth the relevant details in the Boston Harbor clean-up case.

1971: The Commonwealth commissions an initial study to examine alternative plans to end sludge discharges into Boston Harbor. Seven further studies follow.

1972: The Commonwealth agrees with the Federal Environmental Protection Agency (EPA) to build sludge management facilities by 1976. This agreement is never carried out.

1976: The Commonwealth agrees with the EPA to build sludge facilities by 1980. This agreement is never carried out.

1983: The Conservation Law Foundation (CLF) sues the Commonwealth in federal court, claiming violations of the Federal Clean Water Act.

1985: The EPA brings a similar suit. The court consolidates the CLF and the EPA suits.

9/5/85: The district court finds the Commonwealth liable for numerous violations of the Clean Water Act, including the discharge of sludge into the Boston Harbor.

1985–89: The parties develop, and begin to implement, a remedial plan for curing violations of the Act. The MWRA formulates a plan for sludge disposal. It also conducts a search for a possible landfill site, eventually considering 299 possible locations.

5/89: The MWRA designates Walpole as its preferred landfill site; it designates Rowe Quarry in Malden/Revere as a back-up. The court orders the MWRA to report on the status of legislation authorizing the transfer of the Walpole site to the MWRA.

7/89: The Governor defers filing a site-transfer-authority bill until the state environmental review process is completed. The district court, without objection from the EPA, takes no action, but says: "In the event of any slippage in the schedule for completion of the state environmental re-

view process, I will reconsider whether further action is appropriate."

11/89: The Commonwealth's Secretary of Environmental Affairs approves the Walpole and Rowe Quarry sites, ending the state environmental review of the landfill-selection process.

12/89: The court orders the MWRA to report monthly on the status of the site-transfer-authority bill.

3/90: The EPA approves the Walpole and Rowe Quarry sites.

5/15/90: The Governor files a bill in the state legislature that would authorize the MWRA to acquire the Walpole site.

5/18/90: The EPA asks the district court to order the MWRA to pursue the Rowe Quarry option simultaneously if the legislature fails to approve the Walpole bill by the end of June 1990. (The MWRA had earlier said it would need to begin work on the Rowe Quarry site by July 1990 in order to meet the long-term schedule.)

6/6/90: The Commonwealth takes no official position on the EPA's motion, but suggests it should be denied. It adds that the "Administration will do everything in its power to assure passage" of the Walpole bill.

6/20/90: The legislature defers action on the Walpole bill until 12/5/90.

7/2/90: The district court denies the EPA's motion, while noting that it is taking a "huge risk" in doing so. It says that, if the Walpole bill is not approved by December 5, 1990, and slippage in the schedule results, it "intends" to impose sanctions, with the possibilities ranging from "substantial fines, [to] a ban on sewer hookups, to even more pervasive control of the entire process."

7/28/90: The legislature passes a provision (contained in the budget bill) that would preclude use of both the Walpole and Rowe Quarry sites as landfills. The Governor vetoes this provision on August 1, 1990.

10/31/90: The court enters a long-term scheduling order, with specific deadlines designed to ensure that the landfill is operational when the first half of a new primary treatment plant comes on line in July 1994. The schedule requires: (1) final landfill design by November 1991; (2) approval of the final design by April 1992; (3) construction to begin by September 1992; and (4) the landfill to become operational by March 1994.

12/5/90: The legislature fails to take up the Walpole bill.

12/6/90: The EPA asks the court: (1) to order the transfer of the Walpole site to the MWRA by December 31, 1990, and to enjoin the operation of conflicting state laws; or (2) to impose a sewer hook-up ban until either the transfer is effected or the Act is complied with.

12/10/90: The EPA requests, as a third alternative, that the court order the Commonwealth to enact legislation to transfer the Walpole site by December 20, 1990, on penalty of contempt.

12/10/90: The legislature votes down the Walpole bill.

2/25/91: Following a hearing, the court imposes a ban on new sewer hook-ups, applicable (with minor exceptions) to all facilities discharging 2,000 gallons or more of wastewater per day. The ban is to remain in effect until the MWRA acquires a suitable landfill site in compliance with the court's orders.

4/1/91: The court grants the EPA's motion to extend the ban to industrial and commercial hook-ups discharging less than 2,000 gallons of wastewater per day. It denies motions of the City of Boston and the Boston Redevelopment Authority to exempt certain properties from the ban.

4/2/91: The Commonwealth moves to stay or to modify the order. It requests that the ban be lifted for 120 days so that a newly-created Commission can search for alternatives to the Walpole site. If no suitable alternative is found in that time, the Governor promises to promote a 28-year lease of the Walpole site to the MWRA, to submit "all necessary legislation," and to "use his best efforts to secure passage" thereof.

4/5/91: The court denies the Commonwealth's motion.

4/8/91: The Commonwealth appeals and moves for a stay pending appeal.

4/12/91: The MWRA reports that, in part because of its inability to gain prompt and uninterrupted access to the Walpole site, it will likely miss the design-deadline by three months, thereby causing a delay in the start of construction.