USCA1 Opinion

 

 [See Slip Opinion from Clerk's Office for Appendix] UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-1004 CITY OF WALTHAM, Plaintiff, Appellant, v. UNITED STATES POSTAL SERVICE, Defendant, Appellee. _____________________ No. 92-1383 CITY OF WALTHAM, Plaintiff, Appellee, v. UNITED STATES POSTAL SERVICE, Defendant, Appellee. _________ TOWN OF LEXINGTON, Intervenor, Appellant. _____________________ No. 92-1399 CITY OF WALTHAM, Plaintiff, Appellant, v. UNITED STATES POSTAL SERVICE, Defendant, Appellee, __________ TOWN OF LEXINGTON, Intervenor, Appellee. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Aldrich, Senior Circuit Judge, ____________________ and Selya, Circuit Judge. _____________ ____________________ John B. Cervone, III, Assistant City Solicitor, with whom _______________________ Patricia A. Azadi, Assistant City Solicitor, was on brief for City of _________________ Waltham. William L. Lahey with whom Jonathan L. Weil and Palmer & Dodge ________________ ________________ _______________ were on brief for Town of Lexington. Mary Elizabeth Carmody, Assistant United States Attorney, with _______________________ whom A. John Pappalardo, United States Attorney, was on brief for ___________________ United States Postal Service. ____________________ December 2, 1993 ____________________ -2- BREYER, Chief Judge. In November 1990, the United ___________ States Postal Service decided to buy a 36 acre parcel of land, located in Waltham, Massachusetts, just south of Lexington, near the intersection of two busy highways, Route 128 and Route 2. The Service intends to convert the three buildings now on the property into a 400,000 square foot mail distribution facility. Both Waltham and Lexington oppose the project. In May 1991, Waltham filed this lawsuit (in which Lexington later intervened). The towns pointed out that the Service must prepare an Environmental Impact Statement (an "EIS") -- a detailed statement on the environmental impact of the proposed project -- unless a preliminary assessment allows the Service to find that the project will have "no significant impact" on the environment. National Environmental Policy Act of 1969 ("NEPA") 102, 42 U.S.C. 4332(C); 40 C.F.R. 1501.4, 1508.13; 39 C.F.R. 775.6(a)(2). The towns claimed that the Service's finding of "no significant impact" was faulty. And, they asked the district court to enjoin the Service from proceeding further until it prepared an EIS (and complied with several other statutes and regulations). -3- 3 On cross motions for summary judgment, the district court denied the injunction. The court reviewed the Service's several "assessments" of the project's potential environmental impacts, and it concluded that those assessments, taken together, provided adequate factual support for the Service's "no significant impact" conclusion. It rejected the towns' other claims. The towns now appeal the district court's decision. Waltham, in particular, in its brief, makes a vast number of claims and arguments, many of them highly factual and record-based in nature. We have dealt with the claims and arguments as follows. First, we have evaluated what seem to us the most important factual claims -- those most likely to suggest the existence of a significant environmental effect -- in light of a rather thorough, and independent, reading of the 3800 page record (which includes about 1800 pages of "environmental assessments"). Second, we have considered in depth what seem to us the most important non-fact-related legal claims, particularly a question that the towns raise about the composition of the record. Third, in evaluating the towns' many other claims (less significant claims that, once we had read the record, seemed unlikely to have legal merit), we did not go beyond -4- 4 the record citations and the arguments contained on the pages in the briefs where the towns raise those claims. We mention our approach to the case because we wish counsel to understand how a fairly lengthy process of review led to a fairly simple ultimate conclusion, namely, that the district court was correct, and basically for reasons set forth in its ninety-five page opinion. We see no need to rewrite that same opinion. Rather, we shall first explain why we reject the towns' main procedural argument (dealing with the composition of the record). We shall then discuss the main fact-related claims. But, subsequently, we shall indicate only briefly why we reject the other arguments that the towns have made. Counsel should take our statement of reasons throughout as supplemented by those of the district court and by our conclusion that, in respect to each of the fact-related claims, the towns have not pointed to sufficient evidentiary support to create a triable issue. I The Scope of the Record _______________________ The Service's consultants, Rizzo Associates, completed three studies of the project's likely environmental effects. The Service published the first -5- 5 "environmental assessment" in May 1990. After a public hearing, it commissioned a second "assessment," which it published in September. Two months later, at the beginning of November, the Service issued its "finding of no significant impact" (which it conditioned on the assumption that "all proposed mitigation measures are implemented"). Shortly thereafter, the Service asked Rizzo to perform a third study of the site. The third assessment analyzed the potential environmental impact of proposed changes, including new mitigation measures, that the Service intended to make. It also investigated more thoroughly some of the environmental concerns that the towns had expressed. The assessment concludes that its findings "support[] the [finding of no significant impact] issued by the Postal Service" in November. The Service published this third assessment in June 1991 (a month after Waltham brought this lawsuit) as an "amendment" to its earlier assessments. The towns' most important argument on appeal concerns this third study. The towns believe that, without the third study, the district court would have reached a different conclusion about the project's likely environmental impact. And, they argue that the district -6- 6 court should not have taken the third study into account because Rizzo developed it after the Service made its "no _____ significant impact" finding. Cf. Citizens to Preserve ___ ______________________ Overton Park, Inc. v. Volpe, 401 U.S. 402, 419 (1971) ____________________ _____ (warning against accepting an agency's "post hoc rationalizations"). Cast in its best light, the towns' argument amounts to both a logical claim, namely, that information developed after the November 1990 "no significant impact" finding cannot help show that the Service's finding was lawful earlier when made, and a _______ practical claim, namely, that the court, at least, should remand the case to the Service so that it, not the court, can reassess its November 1990 decision in light of the new information. We agree with the towns about the importance of the third study. Without that study, one might find a "substantial possibility" that the project "could significantly affect the quality of the human environment"; and, such a finding would show the need to perform an environmental impact statement. Quinonez-Lopez v. Coco ______________ ____ Lagoon Dev. Corp., 733 F.2d 1, 2 (1st Cir. 1984). Once one _________________ considers the third assessment, however, the "substantial -7- 7 possibility," and the consequent need for an EIS, disappear. See supra p. 6; infra part II. ___ _____ _____ We nonetheless disagree with the towns about court consideration of the third assessment. We are unaware of any hard and fast legal rule forbidding a court's consideration of a subsequently made assessment and project modifications. The district court independently reviewed the third assessment (as have we). We conclude that, in doing so, the court acted lawfully, in light of the following considerations. First, the towns seek more than a simple judicial declaration that the November 1990 decision was inadequately supported when made. (In fact, the district court basically conceded that it was not.) Rather, they seek an injunction __________ requiring, among other things, preparation of an Environmental Impact Statement. The third assessment is highly relevant to the ultimate legal question in the case, namely, the equitable question of whether or not the district court should issue that injunction. It offers strong evidence that the project will have no significant, adverse environmental effects. See supra pp. 6, 7; infra ___ _____ _____ Part II pp. 12-18. It thereby indicates that the relief sought is unnecessary, that an injunction would not serve -8- 8 the public interest, and that one could not justify injunction-related project delays through reference to eventual statutorily-related environmental benefits. Second, the record indicates that remand of the case to the Service for further consideration of the third assessment would serve no useful purpose. The assessment reveals no new environmental harms, nor does it provide evidence that any already considered harm is more likely than previously thought. Compare Massachusetts v. Watt, 716 _______ _____________ ____ F.2d 946 (1st Cir. 1983) (requiring development of a supplementary EIS where new evidence significantly changes previous factual assumptions). Furthermore, the towns have not cast any significant doubt on the reliability of the third assessment's facts or its analysis. Finally, there is no reason to believe that the Service's further consideration of this third, Service-commissioned, assessment would change the mind of a Service that found "no significant impact" upon the bases of two, less convincing, analyses. Cf. NLRB v. Wyman-Gordon Co., 394 U.S. 759, 766 ___ ____ ________________ n.6 (1969) ("[W]e [need not] convert judicial review of agency action into a ping-pong game."). Third, the district court considered the third assessment independently (as have we), without giving the -9- 9 benefit of any particular doubt to the agency in light of any presumed agency expertise, or special legal authority, to resolve such matters. In this way, it guarded against what courts have sometimes called "post hoc rationalization," namely, an effort by agency staff, after an agency has made a decision, to find supporting reasons and data that the agency itself, before the event, might have considered irrelevant or unpersuasive. See Overton ___ _______ Park, 401 U.S. at 419. The risk of "post hoc ____ rationalization" is particularly small in this case, for the document contains the same kind of analysis that the Service earlier found persuasive. It differs from the first two assessments only in that it is more thorough and it considers in detail mitigation measures of the sort that the Service had earlier "assume[d]" would be "implemented." The upshot is that the third assessment is unlike, say, late developed evidence of significant, previously unconsidered environmental harm -- evidence that may require further agency consideration, particularly in a legal context that offers the environment only procedural protection. See Watt, 716 F.2d at 952 (requiring ___ ____ preparation of a supplementary EIS). Rather, the third assessment arises in a legal context in which further -10- 10 environmental investigation and additional mitigation measures may help an agency produce a project that better meets a substantively protective environmental standard (i.e., "no significant impact"). The third assessment provides evidence of increased mitigation and diminished environmental harm. The third assessment is directly relevant to the basic question of court-mandated relief. By itself (and in context) the third assessment indicates that neither an injunction nor remand to the agency is warranted. And (as independently reviewed), the assessment comes unaccompanied with "post hoc rationalization" risks. In this context, we can find no convincing legal reason why the district court should not (independently) have considered the third assessment in reaching its decision not to grant the towns the relief they requested. II The Merits __________ The basic legal question, on the merits, is whether or not the Postal Service could lawfully conclude that its project will not "significantly affect[] the quality of the human environment." NEPA 102, 42 U.S.C. 4332(2)(C)(i). The district court, applying standards at least as stringent as those our cases have proposed, see, ___ -11- 11 e.g., Sierra Club v. Marsh, 769 F.2d 868, 870-71 (1st Cir. ____ ___________ _____ 1985), found the Service's determination lawful. We too have reviewed the record. We have taken what we described in Marsh as the "practical approach" to review, avoiding _____ verbal formulas, but giving the record the type of scrutiny for which the circumstances call. In this case, for the reasons discussed in Part I, that scrutiny, in respect to the third assessment, has been strict. We have reached the same conclusion as the district court, namely, that the record does not show a "substantial possibility" that the project "could significantly affect the quality of the human environment." Quinonez-Lopez, 733 F.2d at 2. ______________ Our conclusions about the record, and our reasons for affirming the district court's decision, are basically those the district court itself described in its ninety-five page opinion, supplemented as follows: 1. Lexington, located just north of the project, says that the project might injure its environment by generating additional truck traffic, at least if postal trucks tend to enter or leave the project from the north. The basic problem with this argument lies in a record that indicates significant numbers of postal trucks will not tend to enter or leave the project from the north. The project -12- 12 is just east of Route 128. Trucks may easily drive from that expressway to the project by way of a road to the south, and they may then turn left and left again, entering the project by means of its southern driveway. (See Appendix for diagrams.) Physical barriers in the road will prevent trucks from turning left (north) as they leave the project along this southern driveway or from turning right into this driveway, should they try to approach the project from the north. Lexington points out that there is also a northern driveway, and it asks, what is to prevent a truck from approaching the project from the north and entering (or leaving) the project along this northern driveway? Although the first two environmental assessments contained diagrams that showed that the northern entry would do the trucks no good (for the northern driveway would not give them access to the truck parking area), the third environmental assessment contains a slightly different diagram that suggests that a truck might enter the project through the northern driveway and drive to the truck parking area. In our view, however, the third assessment's northern-driveway-truck-parking-area connection is not sufficient to show a "substantial possibility" of an adverse -13- 13 environmental impact in Lexington. The government, in its brief, says that the Service "has designated a physical barrier that will prevent trucks from entering or leaving" the project "from the North." The Service says, in its second environmental assessment, that it will enforce a traffic pattern on Postal Service trucks and contract trucks so that they will not enter from, or leave, the facility via the North. The Postal Service's regulations create a binding obligation to implement "[p]racticable mitigation measures identified in an environmental assessment." 39 C.F.R. 775.6(a)(7). And, the district court, in its opinion "expressly rule[d] that the judgment entered . . . is dependent upon the . .. implementation of the . . . traffic design plan . . . ." We interpret the district court's words "traffic design plan" to include a plan that effectively assures that trucks will not enter or leave the facility by means of the northern driveway. That being so, we can find no substantial possibility of an adverse truck traffic impact in Lexington. 2. Lexington also argues that the Service's planned improvement of a roadway intersection near Lexington will mean more traffic traveling through the town, as drivers will choose the improved route over other, more -14- 14 congested, routes. Lexington, however, has produced no factual data that suggests this possibility is other than speculative. Nor can Lexington plausibly argue that the Service should have investigated further and found the relevant data, for Lexington initially implied that it liked _____ the idea of an intersection improvement, not that it opposed the idea. Lexington wrote the Service that it wanted to "understand the anticipated benefits of the intersection ________ upgrade," and it asked the Service for an analysis of "what the impact on Lexington's streets would be if [the] intersection upgrade does not occur." (App. Vol. 2, p. 646, ___ emphasis added). We have found nothing in the record to suggest that anyone thought the intersection might cause added-car-traffic harm of the sort that Lexington now mentions. And, Lexington does not have the right to make new arguments about this problem at this stage of the proceeding. Valley Citizens for a Safe Environment v. __________________________________________ Aldridge, 969 F.2d 1315, 1317 (1st Cir. 1992); Teamsters, ________ __________ Chauffeurs, Warehousemen & Helpers Union, Local No. 59 v. _________________________________________________________ Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992). _____________________ 3. Waltham argues that the project will significantly and adversely affect a nearby wetland, basically by reducing the amount of rainwater that would run -15- 15 off the site into the wetland. Its expert points to certain Postal Service figures that, the expert says, indicate that the project would reduce, by about 25% to 30%, the amount of water that, during a rainstorm, now runs off the buildings and onto the wetlands. The third environmental assessment indicates, however, that rainwater runoff will not decline significantly. The third assessment, in responding primarily to Waltham's earlier claim that the project would discharge too ___ much, not too little, rainwater onto the wetlands ____ (threatening them with additional pollutants), sets forth a detailed stormwater management plan, and, in doing so, discusses the amount of rainwater that will leave the project. It describes water detention basins that keep, but then discharge, water by means of what it calls a "flow- dispersing swale," which discharge will "replicat[e] the sheet flow occurring in a predeveloped condition." The plan, it says, includes methods for encouraging "[g]roundwater recharge." The description indicates that the project will not affect drainage from the existing roof area. It adds that water running off the new roof area will be directed partly to a similar "flow-dispersing swale," and partly to a "subsurface recharge system" that will -16- 16 "replenish the groundwater, avoiding indirect hydrological impacts on the nearby wetlands and stream." Given this discussion of the storm water management plan, taken together with the fact that the district court explicitly conditioned its judgment "upon . . . implementation of the amended stormwater management . . . plan," Waltham, its expert notwithstanding, has failed to show any substantial likelihood that an environmentally significant lessening of rainwater runoff will occur. 4. Waltham says that the Service will build the project in a wetland area, without complying with "wetland construction" legal requirements. The district court, however, found to the contrary. The record shows that the Service collected relevant information about the wetlands. See 39 C.F.R. 776.5(a). Furthermore, the third assessment ___ says that the project will not involve wetland construction. The site plans, as far as we understand them, confirm the assessment's statement. And, Waltham points to no specific evidence that might refute the statement. Regardless, the district court explicitly made its judgment "dependent upon . . . the avoidance of construction in floodplain or wetlands or the discharge of fill into wetlands." -17- 17 5. Waltham says that the Service's proposed addition to the existing buildings, as described in the third assessment, is twice the size of that addition described in the earlier assessments, which fact (Waltham adds) "raises a number of issues which must be addressed" by the Service. One problem with this argument lies in our inability to understand (despite our examination of the various relevant diagrams) how Waltham reached its "enlarged building" conclusions. Regardless, Waltham does not specifically or convincingly explain why any diagrammatic inconsistency between the earlier and later assessments would make a relevant legal difference. A change in size does not automatically mean greater, or different, environmental effects than the record describes. The third assessment's environmental analysis, after all, concerns the (allegedly bigger) building project described in the third assessment. Thus, the analysis of groundwater runoff, for example, that we find adequate (for reasons set out at pp. 15-16, supra) also seems adequate in respect to whatever _____ "enlarged" building that the third assessment describes. Waltham's brief, in the portion devoted to its "enlarged building" claim, refers generally to toxic waste and to the general appearance of the building. But, it provides -18- 18 neither record citations nor specific arguments that could lead us to conclude that whatever changes it has deduced from the diagrams make a relevant difference in these, or other, relevant environmental respects. We therefore cannot accept its "enlarged building" argument. 6. Waltham mentions the project's impact on noise. The district court, however, pointed out that the third assessment thoroughly analyzed the noise problem. The court concluded that, even without the various mitigation measures proposed (measures that postal regulations require the Service to implement, 39 C.F.R. 775.6(a)(7)), the environment will suffer no significant impact on noise. The studies support that conclusion. And, Waltham points to no significantly conflicting evidence. -19- 19 III Procedural Claims _________________ Waltham objects to several of the district court's procedural rulings. We shall briefly explain why we find these objections without legal merit. 1. The district court's decision not to grant the ___ injunction was embodied in its grant of the Service's motion _____ for summary judgment and its accompanying denial of ______ Waltham's converse summary judgment motion. Waltham says that the district court's own summary judgment rule, Local Rule 56.1, required the court to grant the Waltham motion. It points to three parts of the rule: a. The rule says that a party moving for summary judgment must attach "a concise statement of material facts of record as to which the moving party contends there is no genuine issue to be tried." b. The rule adds that the opposing party must then include "a concise statement of material facts of record as to which it is contended that there exists a genuine issue to be tried." c. The rule concludes that any fact "set forth" in the moving party's statement, unless "controverted" in the opposing party's ____________ statement, "will be deemed for purposes of the motion to be admitted by opposing ________ parties." Local Rule, D. Mass. 56.1 (emphases added). Waltham points out that it attached a long statement of facts to its motion -20- 20 for summary judgment, but the Service did not attach a list ___ of facts to its opposition. Hence, says Waltham, the court should have considered its list of facts "to be admitted," and those facts, it believes, entitled it to summary judgment (and the injunction). The problem with this argument is that the Service did submit a "concise statement of material facts" that ___ (despite Waltham's own opposing statements, and for reasons set out here and in the district court's opinion) adequately supported judgment in its favor -- though the Service physically attached that statement only to its own motion ___ for summary judgment without also physically attaching it to ____ its opposition to Waltham's motion. The district court held that the Service's failure also to attach a duplicate of the document to its opposition made no legal difference (even though the Service did not literally comply with the rule). And, that holding makes perfect sense to us. After all, the Service's error (failing to make an additional copy of a document already in the record) was highly technical and nonprejudicial. Waltham, and the court, were fully aware of the Service's view about the facts. Were one to accept Waltham's literal interpretation of the local rule, it could require the district court, nonsensically, to grant both the ____ -21- 21 Service's motion (which all factual statements adequately support) and Waltham's conflicting motion. The district ___ court has authority to interpret its own local rules in nontechnical ways and to avoid such results. United States _____________ v. Diaz-Villafane, 874 F.2d 43, 46 (1st Cir.), cert. denied, ______________ ____________ 493 U.S. 862 (1989). The district court's nonliteral reading of the summary judgment rule, creating an exception for the present circumstances, falls well within the scope of that legal authority. 2. Waltham argues that the district court should have granted its discovery request for "two filing cabinets full" of material that the Service compiled during the course of its environmental investigations. The court denied the request because it accepted the Service's statement that it had not relied upon any of this material in reaching any of the here-relevant conclusions. The court has broad power to control discovery. Santiago v. Fenton, ________ ______ 891 F.2d 373, 379 (1st Cir. 1989). In doing so, it can weigh discovery burdens against the likelihood of finding relevant material. Mack v. Great Atlantic and Pacific Tea ____ _______________________________ Co., 871 F.2d 179, 186-87 (1st Cir. 1989). We will overturn ___ a discovery decision of this sort only when we find it plainly wrong and substantially prejudicial. Santiago, 891 ________ -22- 22 F.2d at 379; Mack, 871 F.2d at 186. Waltham has not ____ provided us with any basis for finding a violation of these legal standards. 3. Waltham argues that the court should have ordered the Service to provide it with a document called the "Berger assessment" -- a document that apparently discusses the environmental effects of choosing other sites for the new facility. Waltham, however, has not convincingly explained why the document is relevant to the legal issues before us in this case. And, it provides us with no basis for finding that the district court violated any of the legal standards described in the preceding paragraph. 4. Waltham asked the district court not to admit in evidence a letter from the Service proposing to pay Waltham $1.6 million for roadway improvements. The district court did not rule on Waltham's claim that the letter was not properly authenticated. The letter, in our view, has no significance. Other documents, properly admitted, say that the Service was willing to pay Waltham $1.5 million for roadway improvements. And, we do not see how the $100,000 difference (between the $1.6 million and $1.5 million offers) could make any difference to the outcome of this case. We have not considered the $1.6 million letter in -23- 23 reaching our decision. Insofar as the district court may have done so (say, in respect to traffic impact), any error is harmless. United States v. Pisari, 636 F.2d 855, 859 ______________ ______ (1st Cir. 1981). 5. Waltham has made various claims to the effect that the Postal Service has acted in "bad faith." We have not found in the record, however, specific evidence of "bad faith" sufficient to invalidate the Service's finding in respect to the lack of adverse environmental impact or to demonstrate a violation of any other relevant law that Waltham has mentioned. IV Adequate Consultation _____________________ 1. The law requires the Service to consult with local authorities about its project. The Intergovernmental Cooperation Act ("ICA"), for example, says that [t]o the extent possible, all . . . local viewpoints shall be considered in planning development programs and projects . . . . ICA 401(c), 31 U.S.C. 6506(c). An Executive Order, elaborating this requirement, says [f]ederal agencies shall provide opportunities for consultation by -24- 24 elected officials of those State and local governments . . . that would be directly affected by . . . direct Federal development . . . . Moreover, [f]or those cases where the concerns cannot be accommodated, Federal officials shall explain the bases for their decision in a timely manner. Exec. Order No. 12,372, 47 Fed. Reg. 30,959 (1982). Waltham claims that the Service violated these legal obligations. It concedes that Service employees met with Waltham officials many times. It does not deny, for example, the accuracy of an affidavit that refers to such meetings in October 1989, January, March, June (two), July, September, October, November and December 1990, and March and May 1991. But, says Waltham, all pre-May 1990 meetings concerned other possible project sites, and all post-May _____ 1990 meetings took place only after the Service had developed a "bureaucratic commitment" to the present site -- which fact, in Waltham's view, makes the post-May 1990 meetings irrelevant. In our view, neither the Act nor the Order requires a federal agency to begin consultations before the agency makes any commitment to a particular project or takes ___ any steps towards carrying out such a project. Nothing in ___ -25- 25 the Act or Order suggests an intent to integrate federal, state, and local bureaucracies to the extent that any such interpretation would require. Nor does the language of the Act or Order suggest an intent to give state or local officials the right to veto federal projects, where, say, speed is important or practical considerations indicate that a degree of pre-consultation federal bureaucratic activity is desirable. Rather, the relevant statutory language simply requires "consider[ation]" of "local viewpoints" during the "planning" stages of a project. In these respects it is quite different from the language of, say, NEPA, a statute that insists that "a detailed statement by the responsible official on the environmental impact of the proposed action" be included in "every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment," that is, at the time when the decision to which NEPA obligations attach is made. NEPA 102, 42 U.S.C. 4332(C)(i); see also Watt, 716 F.2d at 952. ________ ____ With these provisions in mind, we have examined the record. We find the record indicates that the Service provided meaningful consultation, considered local points of view, and made reasonable efforts to accommodate local -26- 26 concerns. Publication of the first environmental assessment in May 1990 did not preclude subsequent, meaningful, consultation, consideration, and accommodation. The development of further assessments, the changes subsequently made to mitigate potentially adverse environmental effects, and other related changes, all show that the Service listened to local viewpoints and made reasonable accommodation efforts. Waltham strongly states the contrary, but it does not point to record evidence sufficient to show either a lack of meaningful consultations or a failure to take local points of view into account, whether those consultations and accommodations took place before, or only after, May 1990. 2. Waltham says that the Service has violated the Executive Order (or the Act) because the project will diminish local tax revenues by $560,000, and the Service did not adequately address these tax consequences. We are willing to assume, for argument's sake, that the Executive Order imposes upon the federal government an obligation, legally enforceable in present circumstances, to make "efforts to accommodate" local concerns and "to explain the bases for their decision" when they do not accommodate local concerns. But still, the Executive Order would not prohibit -27- 27 the federal government from removing local property from state and local tax rolls. It would simply require the government to have a sensible, understandable reason for doing so. In this case, the adverse local tax consequences understandably flow from the federal government's need for a new postal facility and its decision to build that facility in Waltham. More importantly, the Service did consider the tax consequences of its action. The initial environmental assessment identifies the issue and says that the Service had "agreed to provide infrastructure improvements in lieu of taxes," as does the second assessment. Waltham points to no specific evidence that might show, in this respect, a violation of the Act or Order. 3. Waltham makes a similar complaint about the Service's consideration of zoning issues. Both the first and second environmental assessments, however, discuss zoning issues. The assessment notes that the new facility would technically be a nonconforming use, but that it would "not significantly change the existing land use from an aesthetics perspective" and that the previous owner's use of the property was similar to the Service's proposed use. Waltham has not pointed to any specific zoning-related problem that might show a violation of the Act or the Order. -28- 28 4. Lexington points to Postal Service regulations that require the Service to notify it of any proposed environmental assessment before the Service makes that assessment. 39 C.F.R. 775.7(b), 775.10(a). Lexington adds that it did not receive notice prior to publication of the first environmental assessment in May 1990. Assuming (as did the district court) for summary judgment purposes that this is so, the notice failure still does not make a significant legal difference. That is because the Service, after May 1990, provided Lexington with an adequate opportunity to comment, particularly about the potential traffic problems that concerned the town. And, subsequent to May 1990 the Service prepared additional environmental assessments and consulted with Lexington. Because meaningful consultation subsequently took place, any notice violation, in the district court's view, was harmless and did not warrant an injunction. The record adequately supports the conclusion that any such violation would not significantly affect the quality of the environment. V The Clean Water Act ___________________ Waltham argues that the Service has violated the Clean Water Act, 33 U.S.C. 1342, 1344, by failing to -29- 29 obtain two necessary permits: 1) a permit that allows the discharge of material onto wetlands and 2) a permit that allows the discharge of pollutants. We do not believe the Clean Water Act requires the Service to obtain the first permit because the third assessment makes clear that there will not be sufficient discharge of material onto wetlands to trigger the permit requirement. See pp. 16-17, supra. ___ _____ The Service concedes that it needs the second permit, and it is in the process of obtaining it. The district court specified that its "judgment . . . is dependent upon the issuance of [that] permit." We therefore see no need for an injunction. Weinberger v. Romero-Barcelo, 456 U.S. 305, __________ ______________ 316, 320 (1982); United States v. Metropolitan Dist. Comm'n, _____________ _________________________ 930 F.2d 132, 135 (1st Cir. 1991). VI Conclusion __________ We have found none of appellants' arguments of sufficient legal merit to undermine the district court's ultimate determination. We find any remaining arguments without legal merit. For these reasons, the judgment of the district court is Affirmed. ________ -30- 30 NOTE: See Slip Opinion for Appendix. -31- 31